***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the award, the Full Commission AFFIRMS and ADOPTS the Opinion and Award of the Deputy Commissioner with some modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. At all relevant times employer-defendant and employee-plaintiff were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. At all relevant times an employer-employee relationship existed between defendant-employer and plaintiff-employee.
3. In the period March 31, 1999 through March 31, 2000 the carrier on the risk for defendant-employer was Travelers Insurance Company.
4. In the period April 1, 2000 through April 1, 2001 the carrier on the risk for defendant-employer was PMA Insurance Group.
5. As of January 24, 2000, employee-plaintiff developed left and right hand/wrist tendonitis. Defendants Kentucky Derby Hosiery and Travelers Insurance Company submitted a Form 60 Agreement and employee-plaintiff received temporary partial disability benefits from February 19, 2000 to May 20, 2000, in the amount of $1,260.11.
6. A package labeled Proceedings Leading to Hearing was admitted as Stipulated Exhibit No. 2 and a package of medical records was admitted as Stipulated Exhibit No. 3. Subsequent to the hearing, additional medical records were submitted by stipulation as Volume II of Exhibit No. 3.
7. The issues for determination are:
 a. Whether plaintiff contracted a compensable occupational disease, bilateral carpal tunnel syndrome;
 b. If so, when was plaintiff last injuriously exposed to the hazards of such diseases; and
 c. If plaintiff contracted a compensable occupational disease, what compensation, if any, is plaintiff due?
 ***********
The Full Commission adopts the findings of fact found by the Deputy Commissioner and finds as follows:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 29 years old and had completed the eleventh grade in school.
2. Defendant-employer employed plaintiff as a "sock folder" at its facility located in Mount Airy, North Carolina in or about September 1995.
3. Plaintiff continued as a sock folder from the date of her employment until February 2000.
4. Plaintiff worked 48 weeks per year, five days a week. From 1996 to 1999, plaintiff worked 8 ½ to 9 hours per day, inclusive of breaks and meal periods. Beginning sometime in 1999, she began working an additional 5 to 8 hours on Saturdays.
5. Plaintiff's tasks primarily required use of her hands and fingers to fold and band together approximately two thousand pairs of socks daily. She normally folded children's socks, which are thin and lightweight. Plaintiff also used her hands and fingers to push the socks onto a needle so the socks could be bound together. This process requires almost constant use of the hands and fingers in repetitive flexion and extension motions.
6. Throughout plaintiff's employment until January 2000, she had no problem with either of her hands as a result of performing her work duties.
7. For three weeks during late November and early December 1999, plaintiff folded and bound thick men's tube socks for the first time. In order to get these thick socks on the needle to be bound together, plaintiff had to exert significantly greater force with her hands and fingers than she had to exert to manipulate children's socks. The men's socks were so thick that the needle would break on occasions as plaintiff tried to insert the socks onto the needle.
8. Beginning in January 2000, plaintiff began experiencing pain in both her left and right forearm and wrist, with more acute pain on the left. She experienced numbness in her left hand in all fingers.
9. Dr. J. Gil Burke, a board certified orthopedic surgeon, evaluated plaintiff on February 23, 2000, upon referral by defendants. Plaintiff reported the symptoms noted above and reported that her symptoms awakened her at night. Dr. Burke's physical examination was largely negative for carpal tunnel syndrome except for paresthesias of the left wrist. Dr. Burke diagnosed hand and wrist tendonitis, left more than right, "somewhat ill-defined." He doubted plaintiff had developed carpal tunnel syndrome. However, during his deposition testimony, Dr. Burke stated that he was not "comfortable" with any diagnosis because plaintiff's symptoms were so atypical.
10. Dr. Burke restricted plaintiff to light duty work activities. Medications and a splint for the left hand were prescribed and, at the request of defendants, he referred plaintiff to Dr. Matthew Weingold, a hand specialist, for an evaluation.
11. Dr. Weingold evaluated plaintiff on March 14, 2000. Dr. Weingold's physical examination did not find anything medically significant, but he recommended nerve conduction studies to rule out any median nerve compression syndrome.
12. Dr. Travis H. Jackson, a neurologist, examined plaintiff on April 10, 2000, and performed the nerve conduction test. Dr. Jackson's physical examination revealed borderline positive Phalen's signs bilaterally. The nerve conduction test indicated that plaintiff had carpal tunnel syndrome, right worse than left.
13. Dr. Jackson was not certain whether plaintiff's carpal tunnel syndrome was the cause of her multiple, transitory and enigmatic symptoms. Dr. Jackson concluded that plaintiff's symptoms and physical examination did not "fit her symptomatology or her physical examination very well and [he was] not sure that the carpal tunnel syndrome is actually the etiology of her symptoms."
14. Plaintiff returned to Dr. Weingold, the referring physician, on May 16, 2000, who reviewed Dr. Jackson's nerve conduction study. Dr. Weingold stated that some of plaintiff's symptoms are consistent with carpal tunnel syndrome while other symptoms are not. No further treatment was recommended and plaintiff was released to her regular duties with no permanent disability rating.
15. Dr. Burke concurred with Dr. Weingold's opinions. He released plaintiff on May 24, 2000, to her pre-injury duties as a "sock folder" without restrictions.
16. Plaintiff returned to work but was able to fold only about 1,000 pairs of socks because of bilateral hand pain. Folding 1,000 pairs of socks per day is approximately one-half the production plaintiff achieved prior to January 2000. Plaintiff remained at her regular employment duties through August 24, 2000. Plaintiff testified that during this time period she experienced increased pain and swelling in both hands.
17. Plaintiff sought medical treatment for the continuing bilateral wrist pain at Northern Hospital of Surry County on May 29, 2000.
18. Plaintiff subsequently sought treatment from Dr. Anthony J. DeFranzo, an Associate Professor at Wake Forest University/Baptist Hospital Medical Center, on June 22, 2000. Her symptoms were bilateral hand numbness and tingling, weak grip, frequent awakening at night due to severe wrist pain, and pain radiating from her carpal tunnel up to her elbow in each arm.
19. Based on Dr. DeFranzo's physical examination and review of plaintiff's nerve conduction studies, he diagnosed plaintiff as having tendonitis related carpal tunnel syndrome bilaterally. He stated that plaintiff's years of repetitive folding of light weight socks at defendant-employer predisposed her to developing tendonitis, and carpal tunnel syndrome developed when she undertook folding the heavier men's socks that required more pressure in gripping.
20. Dr. DeFranzo concluded that because plaintiff's condition had worsened during the four months since being released to return to work by Dr. Burke, plaintiff would benefit from bilateral endoscopic carpal tunnel releases. Dr. DeFranzo felt plaintiff should only perform light duty work activities due to her carpal tunnel syndrome until the required surgeries could be completed.
21. On August 24, 2000, plaintiff was placed on light duty "dotting bags". "Dotting bags" entails taking a small round sticker and affixing it to a bag of socks. Plaintiff testified that her condition worsened since starting "dotting bags." At the time of the Deputy Commissioner hearing, plaintiff continued to perform this light duty job.
22. Defendants refused to pay for Dr. DeFranzo's treatment, including the proposed surgery for bilateral carpal tunnel syndrome.
23. Al Gorrod, an ergonomic expert, evaluated the "sock folder" position at defendant-employer's Mount Airy plant on January 15, 2001. He stated that plaintiff's employment as a sock folder was 2 on an ascending scale of 10 for repetitive motion disorders, or low risk, and did not place her at an increased risk as compared to the general public of developing cumulative trauma disorders such as carpal tunnel syndrome.
24. On January 24, 2001, plaintiff returned to Dr. DeFranzo who noted that her symptoms were worse since he last examined her. He again recommended carpal tunnel releases performed as soon as possible to avoid permanent irreversible damage to plaintiff's median nerve.
25. On March 8, 2001, plaintiff returned to Dr. Weingold who, in contrast to his March 2000 exam, found that the physical tests he initially used to determine if plaintiff had bilateral carpal tunnel syndrome were now all positive and that plaintiff exhibited some thenar weakness.
26. The Full Commission gives greater weight to the opinions of Dr. DeFranzo over those of Dr. Weingold in respect to the degree of carpal tunnel syndrome that plaintiff currently is experiencing. Additionally, greater weight is given to the opinions of Dr. DeFranzo over those of Al Gorrod. Mr. Gorrod observed plaintiff's job on one day, as opposed to Dr. DeFranzo's experience treating hundreds of carpal tunnel syndrome patients working in the sock industry, including employees from defendant-employer.
27. Plaintiff has proven by the greater weight of the evidence that by February 23, 2000, she had developed bilateral carpal tunnel syndrome as a result of her employment with defendant-employer.
28. Plaintiff has proven by the greater weight of the evidence that her employment placed her at an increased risk for acquiring and developing these occupational diseases as compared to the members of the general public not so employed. Dr. DeFranzo testified that the "general population" has a 0.6 percent chance of developing carpal tunnel syndrome but that individuals that perform highly repetitive jobs have a 6.0% chance of developing carpal tunnel syndrome, 10 times the risk over the general population. Dr. Burke, while hesitant in his opinion, concurred that plaintiff's "sock folder" position put her at some increased risk.
29. Dr. DeFranzo is well qualified and competent to treat plaintiff for carpal tunnel syndrome. The carpal tunnel syndrome releases recommended by Dr. DeFranzo would reasonably tend to give plaintiff relief from her symptoms, even though the relief may not be complete or even substantial.
30. Travelers Insurance Company was the carrier for defendant-employer from March 31, 1999 through March 31, 2000. PMA Insurance Company was the carrier on the risk from April 1, 2000 to April 1, 2001.
31. Plaintiff returned to her regular employment from May 24, 2000 to August 24, 2000, but with production at one-half her normal rate. Her hand condition worsened and she experienced increased pain and swelling.
32. Dr. DeFranzo testified that plaintiff's return to work as a "sock folder," at half-speed and with thin children's socks, aggravated her carpal tunnel syndrome. Dr. DeFranzo did admit that plaintiff's condition might have worsened even if she had not returned to work at all and that the light duty jobs may have aggravated the carpal tunnel syndrome in a minor way.
33. Dr. Weingold testified that plaintiff's return to work augmented her condition to some degree.
34. Plaintiff has proven by the greater weight of the evidence that her last injurious exposure to the hazards of bilateral carpal tunnel syndrome while employed by defendant-employer occurred in the period after April 1, 2000 when PMA Insurance Group was the carrier on the risk.
35. Plaintiff's bilateral carpal tunnel syndrome resulted in partial disability beginning February 24, 2000, and continuing thereafter through at least the date of the hearing before the Deputy Commissioner.
36. Plaintiff's average weekly wage, as shown on the Form 60, is $359.03, which yields a compensation rate of $239.36.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff has proven by the greater weight of the evidence that her carpal tunnel syndrome is characteristic of her occupation as a "sock folder," her employment at defendant-employer increased her risk of exposure to carpal tunnel syndrome as compared to the general public, and that her employment was a proximate cause of her carpal tunnel syndrome. N.C. Gen. Stat § 97-53(13), Hansel v. Sherman Textiles, 304 N.C. 44,283 S.E.2d 101 (1981).
2. PMA Insurance Group was the insurance carrier on the risk when plaintiff was last injuriously exposed to the hazards of carpal tunnel syndrome. Last injurious exposure is defined as an exposure that proximately augments the disease to any extent, however slight. Rutledgev. Tultex Corp., 308 N.C. 85, 301 S.E.2d 359 (1983). Last injurious exposure does not require a showing of a "significant contribution" to the occupational disease. Cain v. Guyton, 79 N.C. App. 696,340 S.E.2d 501, affirmed, 318 N.C. 410, 348 S.E.2d 595 (1986).
3. Plaintiff is entitled to medical treatment that would effect a cure, give relief or lessen plaintiff's period of disability. This treatment includes the endoscopic carpal tunnel releases for each wrist prescribed by Dr. DeFranzo. Dr. DeFranzo is approved as plaintiff's treating physician. N.C. Gen. Stat. § 97-25.
4. As the result of plaintiff's bilateral carpal tunnel syndrome, plaintiff was temporarily partially disabled beginning February 24, 2000, and continuing thereafter through at least the date of the hearing before the Deputy Commissioner. Payment of partial disability shall be limited to 300 weeks from the date of the contraction of the compensable occupational disease. N.C. Gen. § 97-30.
5. An attorney's fee of twenty-five percent of all disability compensation awarded plaintiff herein is approved for plaintiff's counsel. N.C. Gen. Stat. § 97-90. The fee is reasonable given the complexity of this action, including multiple defendants, and the necessity of a hearing to determine the issues presented.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants Kentucky Derby Hosiery and PMA Insurance Group shall pay plaintiff, subject to the attorney fee awarded below, temporary partial disability compensation at the rate of two-thirds of the difference between her average weekly wage of $359.03 and her weekly earnings at defendant-employer for the period beginning February 24, 2000, and continuing weekly thereafter until further order of the Industrial Commission, subject to the statutory 300 week limitation. All past due benefits as of the date of this Award shall be reduced to one lump sum and paid to plaintiff.
2. Defendants Kentucky Derby Hosiery and PMA Insurance Group shall pay all medical treatment incurred by plaintiff as a result of her carpal tunnel syndrome when the same has been presented and approved. The approved medical expenses include treatment by Dr. DeFranzo who is designated as plaintiff's primary treating physician.
3. An attorney's fee is approved for plaintiff's counsel in the amount of 25% of the disability benefits awarded to plaintiff. Of the accrued amount paid in a lump sum to plaintiff, defendants shall deduct 25% of said compensation and forward that amount directly to plaintiff's counsel. For the balance of the attorney's fee, defendants shall send every fourth compensation check to plaintiff's attorney.
4. Defendants shall pay all costs.
This the ___ day of February 2002.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
LKM/mhb